## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

```
AMERICAN FEDERATION OF STATE,    )
COUNTY AND MUNICIPAL             )
EMPLOYEES, LOCAL 77,             )
                                 )
            Plaintiff,           )
                                 )        1:20CV180
            v.                   )
                                 )
DUKE UNIVERSITY,                 )
                                 )
            Defendant.           )
```

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on (1) "Plaintiff's Motion to Compel Arbitration and for Attorneys' Fees" (Docket Entry 9) (the "Arbitration Motion") and (2) the parties' Rule 26(f) Reports (Docket Entries 17, 18). For the reasons that follow, the Court will grant in part and deny in part the Arbitration Motion[1] and stay discovery pending resolution of the arbitration proceedings.

## BACKGROUND

Seeking to compel arbitration of a grievance, the American Federation of State, County and Municipal Employees, Local 77 ("the Union"), initiated this lawsuit against Duke University ("Duke"). (See Docket Entry 1.) Duke filed an Answer, which asserted that the Union had failed to timely file the grievance and had thus

_____

        1    For the reasons stated in <u>Scales v. SSC Winston-Salem Operating, Co.</u>, No. 1:17cv539, 2017 WL 4467278, at *1 n.1 (M.D.N.C. Oct. 5, 2017), the undersigned United States Magistrate Judge will enter an order rather than a recommendation regarding the Arbitration Motion.

"substantively forfeited the ability to challenge the decisions and actions by [Duke] that [the Union] wishes to arbitrate." (Docket Entry 12 at 4-5.)

The Union separately filed the Arbitration Motion, requesting an order (1) compelling arbitration of the grievance and (2) mandating that Duke pay the Union's attorney's fees and costs. (Docket Entry 9 at 1.) According to the Union, an arbitrator must resolve "dispute[s] over the timeliness of a grievance," and attorney's fees are warranted because "Duke lacks any reasonable justification for its refusal to arbitrate." (Docket Entry 11 at 1-2.) In response, Duke maintains its position that the Union forfeited the grievance by failing to timely file it and that the parties had not agreed to arbitrate tardy grievances. (See Docket Entry 15 at 2-3.) Duke further opposes the motion for attorney's fees, arguing that the request contravenes the Court's Local Rules as well as that both the facts and the law support its refusal to submit to arbitration. (See id. at 19-20.)

The parties then tendered separate Rule 26(f) Reports wherein they propose competing plans for discovery. (See Docket Entries 17 & 18.) The Union's Rule 26(f) Report contends that "this case presents a pure question of law and no discovery is required." (Docket Entry 17 at 1.) Duke's 26(f) Report insists that "[d]iscovery should *not* be postponed or limited pending determination of [the Arbitration Motion]" and instead seeks "a

2

limited discovery period." (Docket Entry 18 at 1, 3 (emphasis in original).)

As relevant to the Arbitration Motion and Rule 26(f) Reports, the record reflects the following:

The Union and Duke maintain "a collective bargaining relationship" (Docket Entry 1, ¶ 10), whereby the two have adopted procedures for addressing grievances "between either the Union or an employee and Duke" (id., ¶ 11; see also Docket Entry 1-1 ("Agreement" between Duke and Union dated July 1, 2017 (hereinafter "CBA"))). Article 6 of the CBA defines a "grievance" as "a complaint or dispute regarding the application and/or interpretation of the express provisions of this agreement or, other matters related to Union/Employer relations not removed by law from the area of collective bargaining." (Docket Entry 1-1 at 9.)

The CBA's Article 10 provides that "[a] grievance shall be submitted in writing within ten (10) working days following the day on which the Union or employee first had knowledge of the facts giving rise to the grievance." (Id. at 14.) Article 10 further describes a three-step process for resolving grievances, beginning with a discussion between "the appropriate management representative" and "[t]he employee and/or Union representative." (Id.) Management must reply in writing "within two (2) working days of receipt of the grievance." (Id.)

3

Upon referral "within three (3) working days following receipt of [this reply]," a second step grievance hearing must occur within three working days. (Id.) The second step hearing involves more participants — "the manager or his/her designee of the department, supervisor, a Labor Relations representative from the Employer, the employee, and two (2) representatives from the Union" — and must result in a written reply from "[t]he manager or his/her designee of the employer" within two working days of the hearing. (Id.) A referral to a third step procedure may follow "within five (5) working days following the receipt of the manager's reply." (Id.)

The third step hearing must take place within three working days of the referral and must include attendance of still more individuals: "the Director of Labor Relations and/or his/her designated representative, three (3) representatives from management, three (3) representatives from the Union and the nonemployee union representative." (Id. at 15.) At this stage, the Director of Labor Relations must furnish the reply within three working days of the hearing. (Id.)

Pursuant to Article 11 of the CBA, "[a] grievance, as defined in this Agreement, which is properly submitted to Step 3 of the grievance procedure may be submitted to arbitration by the Union if no satisfactory written answer is received within fifteen (15) working days following the date of the third step answer." (Id.) Article 11 also details how and by when the parties must select an

4

arbitrator, as well as the terms and conditions that apply to every arbitration. (See id.)

The subject grievance relates to the May 2019 termination of Shawn Easterling ("Easterling"), "a member of the bargaining unit represented by the Union," who had worked for 13 years in the housekeeping department at Duke. (Docket Entry 1, ¶ 14.) Prior to Easterling's termination, Duke had suspended him "with pay pending investigation of alleged absenteeism." (Id., ¶ 15.) By letter dated May 20, 2019, Duke notified Easterling that "his employment with Duke was being terminated." (Id., ¶ 16; see also Docket Entry 1-2 (letter from Duke to Easterling dated May 20, 2019).) The Union alleges that it did not, in accordance with Article 6 of the CBA, receive prior notice of Duke's intent to end Easterling's employment. (Docket Entry 1, ¶¶ 16, 18 (discussing provision that "required Duke to provide advance notice to the Union before it mailed the termination notice to [Easterling]").)[2]

"On June 14, 2019, the Union filed a grievance regarding [Easterling's] termination (the 'Easterling Grievance')." (Id., ¶ 17; see also Docket Entry 1-3 (Easterling Grievance form).) The Easterling Grievance form identifies the sole issue as "[w]hether [Easterling] was disciplined for just cause — did [Easterling]

---

2 Article 6 provides, in part: "The Union and Staff and Labor will be notified prior to the mailing of any disciplinary action." (Docket Entry 1-1 at 10 (bold text and underlining omitted).)

violate Duke University Work Rule #16?"  (Docket Entry 1-3 at 1.)[3]
The parties met on August 27, 2019, for the third step hearing on
the Easterling Grievance.  (<u>See</u> Docket Entry 1, ¶ 19.)[4]  The Union
thereafter notified Duke that it would submit the Easterling
Grievance to arbitration in accordance with Article 11 of the CBA.
(<u>See</u> <u>id.</u>, ¶ 20.)  "Duke then indicated to the Union that it would
not agree to arbitrate the Easterling Grievance based on its
contention that the [Easterling Grievance] was not timely filed."
(<u>Id.</u>)  The Union maintains that an arbitrator must decide any
dispute regarding the timeliness of the Easterling Grievance and
that untimeliness does not constitute a defense to arbitration.
(<u>See</u> <u>id.</u>)

## DISCUSSION

## I. Arbitration Motion

## A. Legal Framework

### i. Preliminary Matters

At the threshold, the Union and Duke disagree about whether
the Federal Arbitration Act ("FAA") applies to this matter.  The

---

3    According to the termination letter sent by Duke to
Easterling, Work Rule 16 prohibits "[c]onsecutive absences of three
(3) workdays without notifying the supervisor if, by the end of the
employee's third regular scheduled workday, such notification is
not provided in accordance with departmental procedures."  (Docket
Entry 15-1 at 16.)

4  The record does not reveal when, if ever, steps one and two
took place or whether the Union and Duke complied with the other
Article 10 requirements (including who must attend the hearings,
who must author the reply, and by when the referrals must occur).

6

Complaint purports to seek relief under both Section 185 of the Labor Management Relations Act ("LMRA") and Section 4 of the FAA. (Docket Entry 1 at 1.) However, neither the Arbitration Motion nor the Union's supporting brief mentions the statutory basis for compelled arbitration. (See Docket Entry 9 at 1; Docket Entry 11 at 1–8.)[5] Duke's response asserts that the FAA excludes CBAs, leaving the LMRA as the sole grounds for the Union's request to compel arbitration. (See Docket Entry 15 at 9.) In reply, the Union contends that "[t]he FAA applies to all employment contracts, except those for transportation workers" (Docket Entry 16 at 2 (citing Circuit City Stores, Inc., v. Adams, 532 U.S. 105, 119 (2001))), observes that "the Union's bargaining unit members are not transportation workers" (id.), and concludes that the FAA therefore applies here (see id.).

The FAA renders enforceable written arbitration contracts, "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In relevant part, the statute excludes from its coverage "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." Id., § 1. Previously, a circuit split existed as to the breadth of this exemption; in particular, the Ninth Circuit once "construe[d] the exemption so

---

5 As further discussed below, the brief grounds the request for attorneys' fees in the LMRA. (See Docket Entry 11 at 9–10.)

that all contracts of employment [were] beyond the FAA's reach, whether or not the worker [was] engaged in transportation." <u>Circuit City</u>, 532 U.S. at 109. This interpretation depended on the scope of the phrase "any other class of workers engaged in foreign or interstate commerce," 9 U.S.C. § 1. <u>See</u> <u>Circuit City</u>, 523 U.S. at 114–19 (discussing, before rejecting, "sweeping, open-ended construction" of this language). After analyzing Section 1's text, <u>Circuit City</u> held that the provision "exempts from the FAA only contracts of employment of transportation workers." <u>Id.</u> at 119.

The parties advocate competing understandings of <u>Circuit City</u>. The Union relies on out-of-Circuit cases interpreting the FAA exclusion, in the collective bargaining context, to apply only to such agreements that cover transportation workers. (<u>See</u> Docket Entry 16 at 2 (citing <u>IBEW, Local 111 v. Public Serv. Co. of Colo.</u>, 773 F.3d 1100, 1106 (10th Cir. 2014), and <u>International Bhd. of Teamsters Local Union No. 50 v. Kienstra Precast, LLC</u>, 702 F.3d 954, 955–56 (7th Cir. 2012)).) In contrast, Duke invokes authority from the United States Court of Appeals for the Fourth Circuit (predating <u>Circuit City</u>) and argues that, because <u>Circuit City</u> did not explicitly address whether the FAA applies to CBAs, the Fourth Circuit authority remains good law. (<u>See</u> Docket Entry 18 at 2–3 (citing <u>United Elec. Radio & Mach. Workers of Am. v. Miller Metal Prods.</u>, 215 F.2d 221 (4th Cir. 1954)).)

8

Duke's contentions cannot withstand scrutiny.  In <u>Miller Metal</u>, the Fourth Circuit affirmed the denial of a stay to the defendant unions, after an employer sued under the LMRA "to recover damages for breach of a no-strike clause in a CBA," and the unions, pursuant to the FAA, sought to stay the judicial proceedings. <u>Miller Metal</u>, 215 F.2d at 222.  As grounds for the denial of the stay, the district court relied upon <u>International Union United Furniture Workers v. Colonial Hardwood Flooring Co.</u>, 168 F.2d 33 (4th Cir. 1948).  <u>See</u> <u>Miller Metal</u>, 215 F.2d at 222.  That earlier case had presented the same question under like circumstances, and the Fourth Circuit there concluded that "the provisions of the [FAA] may not be applied to th[e] contract, because it [wa]s a contract <u>relating to the employment of workers engaged in interstate commerce</u>, within the clear meaning of the exclusion clause contained in [Section 1 of the FAA]." <u>Colonial Hardwood</u>, 168 F.2d at 34-35 (emphasis added).  The Fourth Circuit resolved <u>Miller Metal</u> on identical grounds, holding that "the provisions of the [FAA] may not be relied on to stay proceedings in a suit brought on a [CBA] <u>entered into by workers engaged in interstate commerce as those here were engaged</u>." <u>Miller Metal</u>, 215 F.2d at 224 (emphasis added).

Importantly, although <u>Miller Metal</u> and <u>Colonial Hardwood</u> both involved CBAs (whereas <u>Circuit City</u> did not), those two Fourth Circuit holdings depended on an interpretation of language in

9

Section 1 of the FAA that Circuit City no longer permits. In other words, neither Miller Metal nor Colonial Hardwood involved transportation workers, which Circuit City has since identified as the only category of employee excluded from the FAA. The Fourth Circuit has not explicitly overruled Miller Metal, but it has acknowledged intervening Supreme Court authority that calls Miller Metal into question. See American Gen. Life & Acc. Ins. Co. v. Wood, 429 F.3d 83, 91 n.4 (4th Cir. 2005) (describing case that excluded CBAs from the FAA and characterizing Circuit City as having overruled that holding); O'Neil v. Hilton Head Hosp., 115 F.3d 272, 274 n.1 (4th Cir. 1997) (assuming without deciding that Miller Metal "ha[s] any remaining vitality" and noting that the "case predates the substantial body of Supreme Court precedent supporting utilization of the arbitration process"); see also O'Neil, 115 F.3d at 274 ("The circuit courts have uniformly reasoned that the strong federal policy in favor of arbitration requires a narrow reading of this section 1 exemption."). Moreover, another Fourth Circuit case that cited Miller Metal with approval and read the FAA to exclude CBAs also relied upon Section 1's "interstate commerce" language as the basis for the exclusion, see Domino Sugar Corp. v. Sugar Workers Local Union 392, 10 F.3d 1064, 1067-68 (4th Cir. 1993); after Circuit City, such a holding cannot stand (at least as to non-transportation workers), see Circuit City, 532 U.S. at 119.

10

Here, applying Circuit City, a narrow reading of Section 1 does not exclude Easterling from FAA coverage by virtue of his employment in the housekeeping department. Duke does not argue otherwise but insists that the CBA, rather than the nature of Easterling's employment, renders the FAA inapplicable; however, Duke fails to identify any textual support for such a categorical exclusion. (See Docket Entry 18 at 2-3.) The Fourth Circuit's discussion of a rationale for excluding CBAs from the FAA, see Miller Metal, 215 F.2d at 224 ("It appears that the exclusion clause of the [FAA] was introduced into the statute to meet an objection of the Seafarers International Union; and certainly such objection was directed at including [CBAs] rather than individual contracts of employment under the provisions of the statute."), cannot overcome the Supreme Court's subsequent clear declaration that Section 1's exclusion reaches only contracts of employment of transportation workers, see Circuit City, 532 U.S. at 119. The Court thus need not resolve whether the CBA constitutes a contract of employment because Easterling plainly does not qualify as a transportation worker; the FAA therefore applies to this matter.

## ii. Standard for Motions to Compel Arbitration

"A court may compel arbitration of a particular dispute only when the parties have agreed to arbitrate their disputes and the scope of the parties' agreement permits resolution of the dispute at issue." Muriithi v. Shuttle Express, Inc., 712 F.3d 173, 179

11

(4th Cir. 2013). When such an agreement exists, "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83 (1960). "The issue whether a dispute is arbitrable presents primarily a question of contract interpretation . . . ." Muriithi, 712 F.3d at 179.

"Under . . . the [LMRA], district courts, applying federal law fashioned from national labor policy, can order specific performance of an agreement to arbitrate." H.K. Porter Co. v. United Steelworkers of Am., 400 F.2d 691, 693 (4th Cir. 1968). In that regard:

> [T]he federal courts have often looked to the [FAA] for guidance in labor arbitration cases, especially in the wake of the holding that [the LMRA] . . . empowers the federal courts to fashion rules of federal common law to govern suits for violation of contracts between an employer and a labor organization under the federal labor laws.

United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 40 n.9 (1987) (internal brackets and quotation marks omitted).

Under the FAA, "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. "To state a claim to compel arbitration

12

under the FAA, the plaintiff must allege (1) the existence of a
dispute between the parties, (2) a written agreement that includes
an arbitration provision which purports to cover the dispute,
(3) the relationship of the transaction, which is evidenced by the
agreement, to interstate or foreign commerce, and (4) the failure,
neglect or refusal of the defendant to arbitrate the dispute."
Whiteside v. Teltech Corp., 940 F.2d 99, 102 (4th Cir. 1991).  If
the party seeking to compel arbitration establishes the existence
of "an arbitration provision that purports to cover the dispute,"
the party opposing arbitration "must make an unequivocal denial
that an arbitration agreement exists — and must also show
sufficient facts in support."  Chorley Enters., Inc. v. Dickey's
Barbecue Rests., Inc., 807 F.3d 553, 564 (4th Cir. 2015).  "This
standard is akin to the burden on summary judgment."  Id.

   "[S]tate law determines questions concerning the validity,
revocability, or enforceability of contracts generally, but the FAA
creates a body of federal substantive law of arbitrability,
applicable to any arbitration agreement within the coverage of the
Act."  Hill v. PeopleSoft USA, Inc., 412 F.3d 540, 543 (4th Cir.
2005) (internal citations and quotation marks omitted).  "[I]n
applying general state-law principles of contract interpretation to
the interpretation of an arbitration agreement within the scope of
the Act, . . . due regard must be given to the federal policy
favoring arbitration, and ambiguities as to the scope of the

arbitration clause itself [must be] resolved in favor of arbitration." Volt Info. Scis. v. Board of Trs., 489 U.S. 468, 475 (1989). Under North Carolina law, "[a] valid contract requires [1] offer, [2] acceptance, [3] consideration and [4] no defenses to formation." Koltis v. North Carolina Dep't of Human Res., 125 N.C. App. 268, 271, 480 S.E.2d 702, 704 (1997) (citing Copy Prods., Inc. v. Randolph, 62 N.C. App. 553, 555, 303 S.E.2d 87, 88 (1983)). "North Carolina has a strong public policy favoring the settlement of disputes by arbitration. [Said] strong public policy requires that the courts resolve any doubts concerning the scope of arbitrable issues in favor of arbitration." Johnston Cnty. v. R.N. Rouse & Co., Inc., 331 N.C. 88, 91, 414 S.E.2d 30, 32 (1992).

Moreover, the Supreme Court has limited the judicial inquiry into "whether the parties have submitted a particular dispute to arbitration." Howsam v. Dean Witter Reynolds, 537 U.S. 79, 83 (2002). In John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543 (1964), the Supreme Court considered whether a court or an arbitrator should decide "whether 'procedural' conditions to arbitration have been met." Id. at 555–56. In that case, the relevant agreement provided for a three-step grievance procedure and stated that a party's failure to file a grievance within four weeks after its occurrence would constitute abandonment of the grievance. See id. at 555–56 & n.11. The Supreme Court cautioned against the "separation of the 'procedural' and 'substantive'

14

elements of a dispute" and contemplated "cases in which arbitrability of the subject matter is unquestioned but a dispute arises over the procedures to be followed." Id. at 557-58. The Supreme Court affirmed the order directing arbitration, deciding that "it best accords with the usual purposes of an arbitration clause and with the policy behind federal labor law to regard procedural disagreements not as separate disputes but as aspects of the dispute which called the grievance procedures into play." Id. at 559.

More recently, the Supreme Court arrived at a similar result in a case involving proposed arbitration before the National Association of Securities Dealers. See Howsam, 537 U.S. at 81. In Howsam, the applicable provision stated that "no dispute 'shall be eligible for submission [to arbitration] . . . where six (6) years have elapsed from the occurrence or event giving rise to the . . . dispute.'" Id. at 82. After discussing "the presumption . . . that the arbitrator should decide 'allegations of waiver, delay, or a like defense to arbitrability," id. at 84 (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983)), the Supreme Court held that the time limit rule constituted "an 'aspect of the [controversy] which called the grievance procedures into play,'" id. at 85 (quoting John Wiley, 376 U.S. at 559). The party opposing arbitration failed to persuade the Supreme Court that the use of the word "'eligible' . . . indicate[d] the parties'

intent for the time limit rule to be resolved by the court prior to arbitration." Id. at 86. In light of Howsam, the Fourth Circuit has concluded that "arbitrators — not courts — must decide whether a condition precedent to arbitrability has been fulfilled." Chorley Enters., 807 F.3d at 565.

### B. Analysis

The Union's brief in support of the Arbitration Motion — citing John Wiley and Howsam, among others — asserts that an arbitrator must resolve issues regarding the timeliness of grievances. (See Docket Entry 11 at 5-8.) The Union emphasizes the breadth of the CBA's "grievance" definition — insofar as it includes "'the application and/or interpretation of the express provisions of [the CBA].'" (Id. at 6 (quoting Docket Entry 1-1 at 9).) Duke's response argues that no presumption of arbitrability should attach in light of the arbitration clause's narrow scope, that the dispute here implicates substantive arbitrability, and that (even if deemed procedural) the Court should resolve the timeliness issue and should deny arbitration because any rational arbitrator would dismiss the grievance as untimely. (See Docket Entry 15 at 11-18.) The Union's reply maintains that the presumption of arbitrability does apply here, that timeliness remains a procedural issue, that the Court should not consider the facts underlying Duke's timeliness argument, and that Duke's

16

failure to notify the Union (in accordance with Article 6) could excuse any untimeliness. (See Docket Entry 16 at 3-11.)

Under either the LMRA (which may borrow FAA principles) or the FAA itself, the Union has demonstrated the existence of "an arbitration provision which purports to cover the dispute." Whiteside, 940 F.2d at 102. The record indisputably establishes that a dispute has arisen between the Union and Duke and that Duke has refused to arbitrate. Nor has Duke raised a defense to formation going to the CBA's validity, such that an enforceable contract exists. Accordingly, the Court considers only the issue of whether the agreement to arbitrate excludes untimely claims or, put another way, whether the parties intended for a court to resolve disputes over the meaning of the term "properly submitted" (Docket Entry 1-1 at 15).

As an initial matter, the presumption of arbitrability applies to this issue because the CBA undeniably contains an arbitration clause governing grievances in general. See AT&T Techs. v. Communications Workers of Am., 475 U.S. 643, 650 (1986) ("[W]here the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that '[an] order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" (quoting Warrior & Gulf, 363 U.S. at 582-83)).

17

Notwithstanding Duke's opposition to application of the presumption favoring arbitration because the CBA differs from the clause at issue in AT&T Techs. (see Docket Entry 15 at 10–11), the Supreme Court there merely observed that "[s]uch a presumption is particularly applicable where the clause is as broad as the one employed in [that] case," AT&T Techs., 475 U.S. at 650 (emphasis added). In this case, the clause reasonably bears an interpretation rendering the Easterling Grievance arbitrable: the CBA does not define "properly submitted" (Docket Entry 1-1 at 15), and the term could signify that the parties simply must proceed to the third step hearing before a party may demand arbitration (as apparently happened here).[6] The CBA neither defines what constitutes an improperly submitted grievance nor expressly excludes such grievances from arbitration. (See id.)

Furthermore, the clause expresses no clear position on whether a court or an arbitrator should decide a grievance's eligibility for arbitration. On the one hand, the CBA defines "grievance" broadly and appears to contemplate review by an arbitrator of many of the CBA's provisions. (See id. at 9.)[7] On the other hand, the

_____

6  The Complaint alleges that "[t]he parties did not resolve the Easterling Grievance [through the Article 10] process" and that "[t]he parties' meeting for the third and final step of the grievance process was on August 27, 2019." (Docket Entry 1, ¶ 19.) Duke's Answer "admits that the parties met on August 27, 2019." (Docket Entry 12, ¶ 19.)

7  The Union relies on the breadth of the grievance definition but does not suggest that the parties engaged in or even

CBA never directly addresses who should resolve disputes about whether a grievance qualifies as "properly submitted." (See id. at 2–73.) Simply stated, the CBA favors arbitration but falls short of explicitly committing any and all conflicts to an arbitrator. When a matter involves an asserted time bar, which may represent a sort of grievance within a grievance, courts sometimes look to other parts of the contract that reveal the parties' preference for arbitration. See Howsam, 537 U.S. at 81; John Wiley, 376 U.S. at 553, 588.[8]

Given that the (concededly valid) CBA contains a clause that plausibly mandates arbitration under the circumstances and that the parties, at the time of contracting, indicated no explicit preference, the presumption favoring arbitrability carries the day.

_____

contemplated the Article 10 procedure (which seems to apply to all "grievances") to settle their apparent disagreement over the meaning of "properly submitted." (See Docket Entry 11 at 5–8; Docket Entry 16 at 3–8.)

8 For comparison, the clause in Howsam provided that "all controversies . . . concerning or arising from . . . any account . . . ., any transaction . . ., or . . . the construction, performance or breach of . . . any . . . agreement between us . . . shall be determined by arbitration before any self-regulatory organization or exchange of which Dean Witter is a member." Howsam, 537 U.S. at 81. In John Wiley, the parties had agreed that "'[t]he arbitration procedure herein set forth is the sole and exclusive remedy of the parties hereto and the employees covered hereby, for any claimed violations of this contract, and for any and all acts or omissions claimed to have been committed by either party during the term of this agreement, and such arbitration procedure shall be (except to enforce, vacate, or modify awards) in lieu of any and all other remedies, forums at law, in equity or otherwise which will or may be available to either of the parties.'" John Wiley, 376 U.S. at 552 (ellipsis omitted).

Duke's contrary arguments miss the mark.  The CBA's reference to "properly submitted" grievances suggests that certain requirements precede arbitration but not necessarily that a court (rather than an arbitrator) would decide the meaning of the phrase.  Had the parties intended to exclude procedural matters from arbitration altogether, they could have drafted the CBA to reflect this understanding.  See generally John Wiley, 376 U.S. at 553 & n.6 (quoting clauses "expressly deny[ing] arbitration to specific events, situations or contract provisions").

Finally, the CBA's contemplation of forfeiture of untimely grievances fails to tip the balance in Duke's favor.  In both John Wiley and Howsam, the relevant provisions effectively penalized untimeliness by barring tardy grievances from arbitration.  See Howsam, 537 U.S. at 82;  John Wiley, 376 U.S. at 555-56 & n.11. Yet the Supreme Court nonetheless concluded that compliance with procedural requirements normally presents a question for an arbitrator, not a court.  Howsam, 537 U.S. at 85-86;  John Wiley, 376 U.S. at 556-59.  The same holds true here.

## II. Rule 26(f) Reports

The parties' dueling Rule 26(f) Reports propose two different approaches to discovery.  According to the Union, the purely legal questions presented necessitate no discovery.  (See Docket Entry 17 at 1.)  Per Duke, the FAA does not apply here, and the usual practice under the LMRA resolves disputes at summary judgment

20

(which traditionally follows discovery).  (See Docket Entry 18 at
1-3.)  Under either statutory scheme — the FAA or the LMRA — this
matter warrants no discovery for the following reasons.

The FAA authorizes courts to compel arbitration and describes
the procedure for summarily determining entitlement to arbitration
or resolving disputes at trial.  See Chorley Enters., 807 F.3d
563-64 ("[T]he party seeking a jury trial must make an unequivocal
denial that an arbitration agreement exists — and must also show
sufficient facts in support.").  Through the FAA, Congress has
expressed its "clear intent . . .  to move the parties to an
arbitrable dispute out of court and into arbitration as quickly and
easily as possible."  Moses H. Cone Mem'l Hosp., 460 U.S. at 22.
To that end, Section 4 "call[s] for an expeditious and summary
hearing, with only restricted inquiry into factual issues."  Id.

In contrast, the LMRA covers a broader range of potential
disputes and includes no specific provision governing summary
resolution.  See 29 U.S.C. § 185 (entitled "[s]uits by and against
labor organizations).  Further, although the LMRA does not
explicitly contemplate an order compelling arbitration, the Fourth
Circuit has interpreted it to authorize such relief.  See H.K.
Porter Co., 400 F.2d at 693.  As explained above, courts hearing
disputes under the LMRA may borrow principles from the FAA or look
to the latter for guidance as they fashion rules of federal common
law.  See Misco, Inc., 484 U.S. at 40 n.9.

21

"The purpose of discovery is to provide a mechanism for making relevant information available to the litigants." Dillon v. BMO Harris Bank, N.A., No. 1:13CV897, 2015 WL 6619972, at *2 (M.D.N.C. Oct. 30, 2015) (quoting Fed. R. Civ. P. 26 advisory committee's notes, 1983 Amend.). When a party seeks to compel arbitration, whether and to what extent the parties should engage in discovery depends in part on the range of disputed subjects. "Only discovery tailored to matters pertinent to the disposition of the petition to compel arbitration . . . may occur." Id. at *3. For example, "if a party challenges the enforceability of an arbitration agreement, courts generally permit discovery regarding the formation and performance of the arbitration provision." Id. (collecting cases); see also Livingston v. Assocs. Fin., Inc., No. 01C1659, 2001 WL 709465, at *2 (N.D. Ill. June 25, 2001) (observing, in analyzing request to conduct discovery in response to motion to compel arbitration, that a "party must be given an opportunity to pursue discovery related to the issue that it has the burden to prove"), report and recommendation adopted, No. 01C1659, 2002 WL 424352 (N.D. Ill. Mar. 6, 2002). Courts outside the Fourth Circuit have recognized that "the [party opposing compelled arbitration] 'must be given the opportunity to conduct limited discovery on the narrow issue concerning the validity' of the arbitration agreement." Guidotti v. Legal Helpers Debt Resolution, L.L.C., 716 F.3d 764, 774–76 (3d Cir. 2013) (quoting Deputy v. Lehman Bros., Inc., 345

22

F.3d 494, 511 (7th Cir. 2003)); <u>see also</u> <u>id.</u> at 774 n.5 (explaining that pre-arbitration discovery also should occur when a party claims that arbitration would impose prohibitive costs or that unconscionability voids the arbitration clause).

Here, given that the FAA applies, Section 4 permits an order compelling arbitration without discovery. Duke's response focuses on its preferred interpretation of the arbitration clause but stops short of characterizing the entire CBA as invalid and unenforceable. Additionally, Duke never "ma[d]e an unequivocal denial that an arbitration agreement exists." <u>Chorley Enters.</u>, 807 F.3d 563-64. Alternatively, the LMRA supports the same result in light of the purposes of discovery and the nature of this dispute. Because Duke does not contest the validity of the CBA, contract defenses bear no relevance here; discovery on those topics appears pointless. The parties dispute only the scope of their agreement to arbitrate, which constitutes "a question of contract interpretation," <u>Muriithi</u>, 712 F.3d at 179. The Union attached to the Complaint the CBA containing the arbitration clause, the focal point of the inquiry. Given the legal issue presented, discovery would serve no useful purpose. Therefore, the Court decides the issue on the present record and stays discovery pending arbitration.

23

### III. Motion for Attorney's Fees

The Arbitration Motion includes a request for an order directing "Duke to pay the Union's attorneys' fees and costs for prosecuting this action" on the grounds that "Duke's refusal to arbitrate has no reasonable legal justification." (Docket Entry 9 at 1.) The Union's brief in support of the Arbitration Motion explains that, "[u]nder the [LMRA], attorneys' fees may be awarded against a party whose challenge to arbitrability was pursued 'without justification.'" (Docket Entry 11 at 9 (quoting United Food & Commercial Workers, Local 400 v. Marval Poultry Co., 876 F.2d 346, 350 (4th Cir. 1989)).) In opposition, Duke's response asserts that the Union violated Local Rule 7.3(a) by failing to seek such fees via separate motion. (Docket Entry 15 at 19.) On the merits, Duke contends that no controlling authority requires arbitration under the circumstances. (Id. at 20.) The Union's reply maintains that the fee request complied with Rule 7.3(a), but alternatively proposes a denial without prejudice to renewal after entry of judgment. (Docket Entry 16 at 11 & n.3; see also id. at 12 (insisting that Duke baselessly refused arbitration).)

"A request for a court order must be made by motion." Fed. R. Civ. P. 7(b)(1). Duke correctly notes that this Court's Local Rule 7.3(a) further requires "[e]ach motion [to] be set out in a separate pleading." M.D.N.C. LR 7.3(a). This Rule ensures that parties have an adequate opportunity to brief each motion. See

24

<u>Phillips v. Umass Corr. Health</u>, No. 1:18CV974, 2020 WL 128463, at *12 (M.D.N.C. Jan. 10, 2020) (explaining that proper filing of motion for leave to amend allows for necessary briefing). This practice makes good sense because a neighboring provision limits the length of briefs. <u>See</u> M.D.N.C. LR 7.3(d). Motions that seek distinct forms of relief in a single filing may hinder the parties' ability to adequately develop their arguments in support of their respective positions.

Here, Rule 7.3(a) requires that the Union file a separate motion and brief in support of its request for attorney's fees. Although the Arbitration Motion did not "tuck[] away [the fee] request in a lengthy response brief," <u>Phillips</u>, 2020 WL 128463, at *12, neither did the Motion allow for separate treatment and full briefing as required by this Court's Local Rules. Accordingly, the Court denies this aspect of the Arbitration Motion without prejudice to timely resubmission in accordance with applicable rules. <u>See, e.g.</u>, Fed. R. Civ. P. 54(d)(2) (providing that, within 14 days of judgment entry, prevailing party may seek attorney's fees if entitled by "statute, rule, or other grounds" to such award).

<u>**CONCLUSION**</u>

Duke has not overcome the presumption favoring arbitration of an issue like the one here: a dispute over a procedural requirement preceding arbitration; however, the Court exercises its discretion

25

to decline consideration of an award of attorney's fees pending the filing of a proper motion.

**IT IS THEREFORE ORDERED** that the Arbitration Motion (Docket Entry 9) is **GRANTED** as to the request to compel arbitration and **DENIED WITHOUT PREJUDICE** as to the request to award attorney's fees.

**IT IS FURTHER ORDERED** that discovery is stayed pending arbitration.

This 2nd day of March, 2021.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**
